Filed 7/21/26  Marriage of Sedory CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| In re the Marriage of RACHAEL SEDORY and JUSTIN SEDORY. | |
| RACHAEL SEDORY, Respondent, v. JUSTIN SEDORY, Appellant. | F090040 (Super. Ct. No. 15CEFL00387) **OPINION** |

-ooOoo-

APPEAL from an order of the Superior Court of Fresno County.  Steven M. Crass, Commissioner.

Justin Sedory, in pro. per., for Appellant.

McCormick, Barstow, Sheppard, Wayte & Carruth, Jerry D. Casheros and Chloe A. Fernandes for Respondent.

-ooOoo-

For many years, ex-spouses Rachael Sedory and Justin Sedory shared physical custody of their minor daughter, A.S., while Rachael retained sole legal custody.  In 2024, Rachael filed a request for a modified custody order that would give her sole

physical custody of A.S. as well.[1]  Rachael also sought a domestic violence restraining order (DVRO) against Justin.  After a contested hearing on Rachael's DVRO request, the family court entered a five-year DVRO that covered Rachael, Rachael's fiancé, and A.S.  The court also entered an order granting sole legal and sole physical custody of A.S. to Rachael, with no visitation for Justin.  Justin appealed.[2]  We affirm the court's issuance of the permanent DVRO.

## FACTUAL AND PROCEDURAL BACKGROUND

Rachael and Justin were married in 2012 and A.S. was born in 2013.  The couple separated in 2014; their divorce was finalized in 2016.  A child custody order filed on March 17, 2021, awarded joint physical custody of A.S. to Rachael and Justin; however, under the order, Rachael had sole legal custody of A.S.

### Rachael's Request for Custody Modification

On May 16, 2024, Rachael filed a request for order (RFO) to change the then-existing child custody arrangement.  In her RFO of May 16, 2024, Rachael sought sole physical custody and sole legal custody of A.S.  Rachael filed a declaration in support of her RFO, in which she explained her reasons for seeking the requested change in custody.  For example, Rachael explained in the declaration:  "I would like to request that the father take anger management and parenting classes and be drug tested as his behaviors are often bizarre, aggressive, impulsive, vulgar in content, and manipulative."  Rachael added:  "It is in [A.S.'s] best interest that she spend less time with [her father] going forward.  She loves her father, however, so of course, the idea would be increasing time in the future should he demonstrate improved behaviors."

On July 3, 2024, Justin filed a responsive declaration to Rachael's RFO regarding custody.  Justin opposed Rachael's request for modification, asking instead for the

---

[1]     For purposes of clarity, we refer to the parties by their first names.

[2]     Justin is self-represented on appeal.

2.

existing custody order to remain in place, with the parties continuing to share physical custody of A.S. In his declaration, Justin further stated: "I will admit, over the years I've said some pretty horrible things to [Rachael] and called her every name in the book and then some. Is it right? No." Justin added: "I don't need parenting classes or drug tests or any of that nonsense. Am I perfect? No, nobody is. That doesn't mean though that I've done anything to deserve even being put through this crap." Justin continued: "Even after all the crap that [Rachael] has pulled and tried to hurt me with, I'd still be willing to try and get along better with [her] as [co-parents] to our amazing daughter. However, she needs to be held responsible for these false accusations and lies and understand her actions are unacceptable."

On October 14, 2024, a counselor from family court services met with Rachael and Justin, and interviewed A.S., for Tier II mediation.[3] The counselor prepared a written report entitled "Tier II – Summary Report" (Tier II report) for the family court. The counselor stated in the report:

> "The child provided this counselor with credible information regarding her relationship with both the mother and the father. With regard to the mother, the child finds the mother to be kind and enjoys her close relationship with the mother. Similarly, the child spoke highly of her relationship with the father, sharing that she enjoys being with the father and feels close and connected to him. Overall, this counselor assesses that the child is attached and well-bonded to both the mother and the father. Additionally, the child shared that she enjoys her custodial schedule, as it provides her access to both the mother and the father, further highlighting for this counselor the child's bond and attachment to both the mother and the father. The only complaint the child expressed with regard to her custodial schedule was her perception that the mother was trying to take her away from the father by stopping the child's once-per-month Friday overnights. The child indicated that she very much enjoyed those Fridays with the father and is frustrated that the mother stopped them, telling the child that she does not believe that the child is safe with the father. Thus,

---

**3** The parties had previously attempted Tier I mediation, which was unsuccessful and was discontinued.

3.

this counselor is not only concerned that the mother directly speak[s] about her concerns to the child but that the child blames the mother for limiting her time with the father, consequently straining the child's relationship with the mother."

The counselor added in the Tier II report: "During the mother's custodial time, the child resides with the mother, the mother's significant other, and the child's two step-siblings. The child did not share any information that would cause this counselor concern regarding her relationships in the mother's home." The counselor further noted: "In the father's home, the child resides only with the father." The counselor continued: "[T]he child indicated she feels safe and well cared for in the father's home." However, the counselor expressed concern that the child had indicated that both parents made derisive comments regarding the other parent to the child. Specifically, Rachael "often shows [A.S.] long text messages from the father and informs the child that the father leaves the mother angry voicemails." As for Justin, he "has referred to the mother as a 'bitch' to the child."

***Rachael's First Request for Domestic Violence Restraining Order (October 2024)***

On October 17, 2024, Rachael filed a request for a DVRO, which request is not in the record on appeal. The family court declined to issue a temporary restraining order and set the matter for hearing on November 4, 2024. In the meantime, on October 31, 2024, the court held a hearing in the pending custody matter; both the custody and DVRO matters were addressed at the hearing.

The record on appeal includes a settled statement in lieu of a reporter's transcript for the October 31, 2024 hearing. According to the settled statement, at the hearing, Rachael's counsel "requested a contested hearing pursuant to Family Code section 217 and also requested that the DVRO matter … be advanced and set with the custody case in the same department." The settled statement further states: "In order to vacate the [existing] November 4, 2024 [initial] hearing date on the DVRO and set both the DVRO and custody matter for a [trial] setting [hearing] in a long cause courtroom, the [c]ourt

4.

addressed the issue of waiver of service [of the DVRO]." As noted in the settled statement, "[t]he [c]ourt's intent was to consolidate *scheduling* so that both the custody matter and the DVRO could be set together for trial setting." (Italics added.)

The settled statement explains: "There was significant discussion led by the [c]ourt regarding scheduling and whether hearing both matters together would be most efficient [as] the issues appeared related and best handled together." The settled statement also notes: "[Justin] expressed his belief that the issues raised by [Rachael] both in the custody request and DVRO [request] were manufactured." The settled statement clarifies: "The [c]ourt again declined to make any temporary orders related to either the request for restraining order or custody modification, and the status quo remained." The trial setting hearing in the custody and DVRO matters was calendared for November 15, 2024.

On November 6, 2024, Justin retained an attorney, and on November 14, 2024, he filed, through counsel, a response to Rachael's request for a restraining order. On November 15, 2024, at the trial setting hearing, both the DVRO and custody matters were set for contested hearing or trial on August 11-13, 2025. Subsequently, on December 23, 2024, Justin's counsel withdrew from representing Justin. Thereafter, Justin represented himself.

### Rachael's Second Request for Domestic Violence Restraining Order (January 2025)

On January 3, 2025, Rachael filed a second DVRO request, based on incidents that occurred in December 2024, in addition to incidents from October 2024 (when she had filed her first DVRO request). Rachael's second DVRO request was supported by detailed declarations and relevant documentation from Rachael and her fiancé, Grant W.[4]

---

**4** Rachael noted in her declaration that she had previously obtained, in 2015, a permanent, one-year DVRO against Justin, which order expired on February 24, 2016. She further noted that she filed her October 2024 DVRO request "due to Justin's behaviors escalating after I filed for a modification of child custody and visitation [in May 2024]." Rachael's declaration detailed multiple incidents involving abusive

5.

In the second DVRO request, Rachael stated: "On December 12, 2024 and December 19, 2024 Justin showed up to my house unannounced and uninvited. He left a 10 minute [R]ing door bell video stating he will be filing a series of complaints with the Board of Behavioral Sciences, [which] oversees [my professional] licensing IF I don't … stop this (meaning the child custody and visitation [t]rial). He also threatened to call CPS. He basically said he would do anything in his power to harm our pool business [as well]." Rachael added: "[Justin] ended the [Ring] messages with saying he will give me a day or two and if I don't reach out he will start doing these things. All the while, he has physically attacked and threatened my significant other, and repeatedly sent me messages (text and voice mail) calling me a 'cunt' and other horrible names."

Rachael further stated in her second DVRO request: "On October 24, 2024, prior to our October 31, 2024 hearing date for child custody and visitation, Justin left me the following voice[mails]:– 'Can't wait for the Judge to look at you and legally tell you to fuck the fuck off, you overflowing diaper genie dumpster diving human being[.]' 'Go fuck yourself you dumb fucking cunt[.]' 'Play this message for the Judge, please. I do not care.' Calling me mentally unstable and with the hearing being on Halloween [he further] stated[,] 'I know you can't take your cunt costume off, but maybe try, you know for the Judge, maybe it will help your case a little bit[,]' 'God you're a fucking piece of shit[,]' [and] 'God I hope you burn in hell!' "

In addition, Rachael described in her second DVRO request an incident that occurred on October 14, 2024: "Justin showed up at my house and caused a physical altercation with Grant. Therefore, I called the police. There is [R]ing camera footage of the incident. In the video you can see Justin aggressively coming towards my front door

___

behavior on Justin's part, going back to 2021. She explained in her declaration that she was not represented by counsel when she filed her October 2024 DVRO request; subsequently, she retained counsel, and hence her second DVRO request was more detailed and comprehensive.

as though he was going to knock Grant down and come into my home. I was fearful o[f] what he would do if he were to come into my home. Justin also pushed Grant and assaulted him. It is clear that he was the aggressor[,] in this footage. A copy of … the video can be provided to the [c]ourt."

On January 6, 2025, the family court declined to issue a temporary restraining order pending an evidentiary hearing; a hearing on the second DVRO request was set for January 27, 2025.

On January 22, 2025, Rachael filed a supplemental declaration in support of her January 3, 2025 request for DVRO; Rachael's attorney filed a supplemental declaration at the same time.[5] In her supplemental declaration, Rachael described multiple incidents of abusive behavior on Justin's part. Rachael averred that many incidents were captured on the Ring camera at her house and/or documented in police reports she had filed upon calling the police to her home. In addition, she attested that Justin had left abusive voicemails and sent her angry and profane texts. Rachael provided documentation supporting the averments in her supplemental declaration.

Rachael concluded in her supplemental declaration: "As outlined above and in my request filed on January 3, 2025, Justin's behavior[s] will not stop. He has continuously come to my home, harassing and threatening both Grant and I. He has told us he won't stop and by his own admission to the officers [called to my home] on January 21, 2025, [said he] will show up at my work if he can't show up at my home. The hearing on child custody and visitation and my restraining order filed in October 2024 is not until August 2025. Without [a] restraining order, Justin has shown through his actions, that he will continue to harass me until the hearing." Rachael clarified that as of January 21,

---

[5]     Among other things, Rachael's attorney noted in his declaration: "[Justin] continues to approach this case in an aggressive and threatening manner, when I have been nothing but calm and respectful to him." Rachael's attorney attached to his declaration, several emails from Justin.

2025, she had not yet served Justin "with the most recent restraining order request in fear that his behavior would escalate even more."

On January 27, 2025, Rachael's second DVRO request came on for hearing, with both parties present (Rachael's counsel was present with her). A reporter's transcript of this hearing is included in the record on appeal. After discussing the matter with the parties, the family court reversed its prior decision denying a temporary restraining order and granted a temporary restraining order in favor of Rachael.

The family court thereafter addressed scheduling a contested hearing on the issue of a permanent restraining order. When the court suggested advancing the contested hearing on a permanent restraining order from August 2025, Justin responded: "Absolutely." With input from Justin as well as Rachael's counsel, the court advanced the contested hearing in the DVRO matter to February 24, 2025, thereby decoupling the DVRO matter from the pending custody matter (previously, both matters were set for trial in August 2025). However, since the court granted a temporary restraining order, it further ordered that Justin would have agency-supervised visits with A.S. "twice a week for two hours a visit," pending the February 24, 2025 contested hearing on a permanent DVRO.

### Rachael's Trial Brief

Rachael filed a trial brief on February 14, 2025. Rachael noted in her trial brief: "Since the issuance of the [t]emporary [r]estraining [o]rder, [Justin] has become completely unhinged." She added that after the January 27, 2025 hearing at which the family court granted a temporary DVRO, Justin waited across the street as Rachael and her family left the courthouse. Rachael and her family "had to wait about 30 minutes before being escorted to their cars." Rachael further stated: "That same day, [Justin] went to [A.S.'s] school with a sign that spoke negatively about [Rachael] and stood outside. School officials were alarmed, placed the school on lockdown and the police arrested [Justin] for violation of the [r]estraining [o]rder."

8.

Rachael also detailed several other violations of the temporary restraining order committed by Justin since the last hearing, including that Justin was arrested on February 12, 2025, on a stalking charge. Rachael further noted: "The evidence and testimony will show that [Justin] is aggressive, erratic and verbally and emotionally abusive [and] is spiraling out of control." She asked for a five-year restraining order and requested that Justin be ordered to complete a 52-week batterer intervention program.

***Justin's Response to Rachael's Second DVRO Request***

On February 21, 2025, Justin filed a response to Rachael's second DVRO request.[6] Although Justin disputed many things, he stated in his response: "I am guilty of saying some very crude and horrible things to Rachael and Grant, on a number of different occasions. It was done with intent and purpose. I wasn't unhinged at all and knew very well that they would use it against me. The intent was to annoy, bother, and cause the same amount of pain I have been going through every morning I have woken up since May when Rachael [moved for modification of custody]."

Justin added: "I decided to become an absolute thorn in their side [i.e., Rachael's and Grant's sides] for one reason and that has been to try and hold them accountable for lying to steal custody of my daughter away. I don't know what they expected my reaction to be, but it's almost as if they are surprised that I'm upset about it, which is ridiculous. Naturally, anyone is going to be irate with someone doing something so evil and would do anything they could to prevent that from happening." Justin further stated: "I was going to be as rude and vulgar towards them as possible, and attempt to make their lives as uncomfortable as I could so they could feel a little bit of what I had been feeling."

---

[6] Justin's response to Rachael's second DVRO addressed some points raised in her trial brief, as well.

9.

In his response to Rachael's second DVRO request, Justin further stated that he would not call A.S. as a witness at the contested hearing in the matter. He noted: "[A.S.] has already seen enough and been put through enough hell from her mom and being manipulated and all the unpleasantness she has seen first hand. I refuse to put her in the position of being questioned in court and its Dad vs Mom. No little girl should have to do something like that. I hope that move doesn't backfire on me but if it does, [I'll] just have to suffer the consequences because that little girl shouldn't have to deal with any of this, any longer."

Thereafter, at the contested hearing on February 24, 2025, Justin asked the family court for a continuance to properly prepare for hearing. The court granted Justin's request and reset the contested DVRO hearing to April 30, 2025, ordering all subpoenaed witnesses to return at that time.

***Rachael's April 21, 2025 Supplemental Declaration***

On April 21, 2025, Rachael filed another supplemental declaration. In this supplemental declaration, Rachael attested: "I write this [d]eclaration to advise the [c]ourt of what has occurred since the last hearing on February 24, 2025. I left that hearing hoping that the situation would settle down, for the benefit of our daughter [A.S.] Unfortunately, things have gone in the opposite direction since that time. <u>What has occurred can only be described as a complete unraveling by Justin, which has resulted in the police [i]ssuing an Emergency Protective Order (EPO) protecting both [A.S.] and me</u>."

In addition, Rachael noted that on February 24, 2025, the family court had ordered the parties to register for and use a particular application for communicating, to prevent Justin from directly contacting Rachael. Rachael declared that Justin registered for the application on February 26, 2025, but proceeded to misuse it to send threatening messages and to post voluminous journal entries to harass Rachael. Rachael noted: "[Justin] doesn't understand the gravity of what is going on and continues to violate

10.

[c]ourt orders." Rachael also described inappropriate direct communications Justin sent to Rachael's fiancé, Grant, as well as his efforts to reach A.S. Rachael requested the court to ensure that any post-hearing restraining order granted by the court would cover Grant as well. Rachael provided documentary support for the averments in her declaration; she also provided a supplemental declaration from Grant.

On April 24, 2025, Justin filed a declaration disputing the characterization of his conduct detailed in Rachael's supplemental declaration.

### April 30, 2025 Contested Hearing on Rachael's Request for a Permanent DVRO

The contested hearing in the DVRO matter took place on April 30, 2025 and May 1, 2025. The record on appeal does *not* contain a reporter's transcript *or* settled statement of the contested hearing. In other words, Justin has not provided any record of the testimony and other evidence presented at the contested hearing.

On May 2, 2025, based on the evidence presented at the contested hearing, the family court entered a permanent restraining order protecting Rachael, Grant, and A.S. The court also ordered Justin to complete a 52-week batterer intervention program.

The restraining order issued by the family court did not provide an exception for brief and peaceful contact to allow for custody or visitation for Justin; indeed, the restraining order barred contact with A.S., as with Rachael and Grant. Accordingly, the court issued, the same day, an order regarding custody. The court's order granted Rachael sole legal and physical custody and stated that "[t]he father shall have no contact/visitation with the child pending further order of the [c]ourt." The order notes that Justin "was given notice and an opportunity to be heard."

### Family Court's Written Ruling

On May 2, 2025, the family court issued a detailed, written ruling explaining its decision to grant a permanent DVRO in favor of Rachael, Grant, and A.S., as well as sole legal and physical custody to Rachael. Upfront, the court noted: "The [c]ourt, having considered the testimony, documentary evidence, pleadings, and arguments of the parties,

11.

now makes the following findings and orders. Court finds that [Rachael] has proven by a preponderance of evidence that there was at least one act of domestic violence and grants the requested restraining order for a period of five years."

The family court thereafter listed numerous findings of fact. For example, the court found: "On December 11, 2024, January 8, 2025, January 9, 2025, and January 21, 2025[,] [Justin] went to [Rachael's] residence uninvited and left Ring doorbell messages lasting up to nine minutes containing profane, threatening, and harassing language—repeatedly referring to [Rachael], among many other offensive terms, as a 'b[*]t*h' and 'c[*]n*'. [Justin] further threatened to report [Rachael] to the Board of Behavioral Sciences (which governs her professional license), and interfere with her significant other's business unless she abandoned her DVRO and custody modification request." (Fns. omitted.)

The family court further found: "Beyond the Ring messages, there were text messages (including from the child's phone), voicemails (from numerous numbers), and e-mails (including from an alias)—all of which incorporated verbal attacks. The videos, text messages, and voicemails were all admitted without objection." The court pointed out that Justin agreed that "these incidents occurred in the context of [his] anger over the pending family law litigation and his perception that [Rachael] was lying during the custody process."

The family court also found that, after the January 27, 2025 hearing where the court issued a temporary restraining order, "[Justin] loitered in the court parking lot for approximately 45 minutes, necessitating law enforcement to contact [him] and escort [Rachael], her significant [other], and other support people to their car." The court further determined: "Later that day, [Justin] appeared near the child's school holding a sign accusing [Rachael] of mentally abusing the child."

In addition, the court determined that shortly after the temporary restraining order was issued, Justin called law enforcement to request a welfare check on A.S. and then

12.

flagged down the responding officer in the vicinity of Rachael's house. The officer testified there was no basis for the welfare check and Justin's presence in the area was concerning. The court also noted that Justin repeatedly called Grant both before and after issuance of the temporary restraining order, and in the days leading up to the contested hearing, leaving "extremely crude and threatening" voicemails. The court observed the content of the voicemails made it clear they were "intended to be conveyed to [Rachael]." Justin also "engaged in 'journaling' through the court ordered parenting application that echoed the same concerning tone."

Finally, the court pinpointed Justin's own words in his response to Rachael's second DVRO request: " 'I am guilty of saying some very crude and horrible things … it was done with intent and purpose …. The intent was to annoy, bother, and cause the same amount of pain … to make their lives as uncomfortable as I could.' " The court determined: "This sentiment was also conveyed in court, multiple times, both in the form of argument and sworn testimony. This is a direct admission of conduct that falls well within the scope of Family Code [section] 6320, including harassment, verbal abuse, and conduct that disturbs the peace of the protected party. There were other direct admissions in [Justin's] filings with the [c]ourt, which were also confirmed during sworn examination."

The family court analyzed the issues. The court noted: "Here, [Justin] chose the wrong way again and again, and continued to do so regardless of [c]ourt admonishments, [c]ourt orders, law enforcement guidance, law enforcement action, and communication with opposing counsel. [Justin] had a multitude of off-ramps, even including some contrition at the DVRO hearing itself." (Fn. omitted.) The court observed that instead of availing the off ramps, "[Justin] testified that although he had no current plans to continue to text [Grant] harassing text messages, he wasn't sure if he would stop." The court added: "[H]is actions demonstrate an inability to focus on the best interest of the

minor child because his sole focus is with his scorched earth tactics aimed at [Rachael] and her significant other. At this stage, [Justin] has demonstrated he cannot co-parent."

The court continued: "Also at this stage, [Justin's] actions show that he simply refuses to abide by court orders or rules of agencies.[7] He has also involved the child in the custody dispute and, perhaps unintentionally in the domestic violence, by creating fear and disruption at [Rachael's] residence, directly discussing issues related to the DVRO/custody case through text messages, blaming [Rachael] for the current status, and most notably creating a situation where the daughter's school was placed on a lock down because [Justin] was standing on the street with a sign saying that his daughter's mother … was abusing his daughter." (Fn. omitted.)

The family court further observed: "And, while [Justin] claims that [Rachael] has also involved the child in the custody dispute, his actions both in and out of court are so extreme and the vitriol so intense, the [c]ourt must now ensure that the child not be a witness [to] or in any way involved with his anger toward [Rachael]. Moreover, [Rachael] and her significant other must be given a reprieve from having to engage with [Justin] in any way."

The family court summed up: "[T]he [c]ourt concludes that [Justin] has engaged in conduct described in Family Code [section] 6320, including but not limited to harassment, threats, disturbing the peace of [Rachael], and engaging in coercive and controlling behavior." The court added: "The [c]ourt further finds that [Rachael] was placed in a reasonable apprehension of imminent serious bodily injury." The court continued: "Furthermore, the [c]ourt finds 'good cause' based on the totality of circumstances noted in the facts set forth above, to include [Rachael's] significant other

---

7    The court explained: "There was testimony that after the initial court order for agency supervised exchanges, that those services were terminated based on [Justin's] repeated violations, despite attempts by the agency to have them corrected."

14.

and the child. (See § 6320, subd. (a).) While not required[,] the [c]ourt finds there is a potential jeopardy to the safety or well-being of both of the 'other' protected parties."

The family court further noted: "The [c]ourt finds that Family Code [section] 3044 applies, creating a rebuttable presumption against sole or joint custody to [Justin] due to the finding of domestic violence. Indeed, until [Justin] can demonstrate self-awareness and control of his actions and how they impact the child, there is to be no visitation or contact with the minor child. The DVRO is therefore GRANTED for a period of five (5) years on the terms set forth."

This appeal followed.

## DISCUSSION

### I. Standard of Review

We review the grant or denial of a request for a DVRO for abuse of discretion. (*In re Marriage of Davila and Mejia* (2018) 29 Cal.App.5th 220, 226 (*Davila*).) " ' "However, '[j]udicial discretion to grant or deny an application for a protective order is not unfettered. The scope of discretion always resides in the particular law being applied by the court, i.e., in the " 'legal principles governing the subject of [the] action.' " ' " ' " (*Ibid.*)

We likewise review the trial court's refusal to consider particular evidence in issuing a DVRO for an abuse of discretion. (*Ibid.*) " ' "To the extent that we are called upon to review the trial court's factual findings, we apply a substantial evidence standard of review." ' " (*Ibid.*)

### II. DVROs: Applicable Legal Framework

The stated purpose of the Domestic Violence Prevention Act (DVPA) (Fam. Code, §§ 6200–6460),[8] is to "prevent acts of domestic violence, abuse, and sexual abuse and to provide for a separation of the persons involved in the domestic violence for a period

---

[8] Subsequent, undesignated statutory references are to Family Code.

sufficient to enable these persons to seek a resolution of the causes of the violence." (§ 6220.)

As relevant here, the DVPA defines domestic violence as "abuse" perpetrated against a former spouse or the child of a party. (§ 6211, subds. (a) & (e).) The DVPA authorizes courts to issue restraining orders based on "reasonable proof of a past act or acts of abuse." (§ 6300, subd. (a).)

The DVPA defines the term "abuse" broadly. The definition includes "any behavior that has been or could be enjoined pursuant to Section 6320." (§ 6203, subd. (a)(4).) Section 6320 in turn authorizes courts to enjoin conduct including "molesting, … stalking, threatening, … harassing, … making annoying telephone calls," or "disturbing the peace of the other party." (§ 6320, subd. (a).) In addition, " 'disturbing the peace' " is defined as conduct that "destroys the mental or emotional calm of the other party." (§ 6320, subd. (c).) Thus, under the DVPA, courts may enjoin conduct that destroys a person's calm and tranquility. (See, e.g., *In re Marriage of Nadkarni* (2009) 173 Cal.App.4th 1483, 1498 ["former husband's alleged conduct in destroying the mental or emotional calm of his former wife by accessing, reading and publicly disclosing her confidential e-mails" would constitute abuse within the meaning of the DVPA].)

The DVPA authorizes a trial court to issue a DVRO only if it finds reasonable proof of past abuse. Specifically, section 6300 provides that a restraining order may be issued "if an affidavit or testimony and any additional information provided to the court … shows, to the satisfaction of the court, reasonable proof of a past act or acts of abuse." (§ 6300, subd. (a).) The DVPA requires a showing of past abuse by a preponderance of the evidence. (*Davila*, *supra*, 29 Cal.App.5th at p. 226.)

Although a temporary DVRO may be issued on an ex parte basis without notice, a permanent restraining order may only be issued " 'after notice and a hearing.' " (*Davila*,

*supra*, 29 Cal.App.5th at p. 226; see §§ 6320, subd. (a), 6322, 6340, subd. (a), 6345, subd. (a).)

The court has the discretion, on a showing of good cause, to extend a restraining order to protect family members or household members of the protected person. (§§ 6320, subd. (a), 6340, subd. (a)(1).)

### III.    Justin has not Shown he was Denied Due Process at the October 31, 2024 and January 27, 2025 Hearings Before the Family Court

Justin makes multiple arguments to the effect he was denied due process at the hearings held on October 31, 2024 and January 27, 2025. We are not persuaded.

#### A.    *October 31, 2024 Hearing:  Tier II Report*

First, Justin contends that the family court was "required," at the October 31, 2024 hearing on Rachael's custody modification RFO, to directly "question" Rachael about the Tier II report submitted by Family Court Services.

The family court's minute order regarding the October 31, 2024 hearing specifically states that "[t]he parties and the court reviewed the tier report and recommendations." In addition, the court addressed the DVRO request that Rachael had filed on October 17, 2024, which was scheduled for hearing on November 4, 2024. The court vacated the November 4, 2024 hearing on the DVRO request and set both the custody and DVRO matters for a trial setting hearing on November 15, 2024.

In light of Rachael's DVRO filing, the family court's minute order from the October 31, 2024 hearing further noted:  "The [court] will *not* be changing the custody times or schedules in the [existing custody] order, but will add [to the latter] by minute order:  [¶]  Commencing today and [upon] the signing of this order, the [c]ourt orders [that] all *exchanges* shall be at [a] [s]upervised [a]gency[, namely,] CSS in Clovis." (Italics added.)

Justin has not shown the family court was required to directly question Rachael about the Tier II report at the October 31, 2024 hearing, at which the court calendared

17.

both the custody and DVRO matters for trial setting and kept in place the existing custody schedule.

Justin's argument is only a few sentences long and is not properly developed nor has he cited any legal authority in support thereof. Accordingly, we need not address it further. (See *Department of Alcoholic Beverage Control v. Alcoholic Beverage Control Appeals Bd.* (2002) 100 Cal.App.4th 1066, 1078 ["Mere suggestions of error without supporting argument or authority … do not properly present grounds for appellate review."].)

### B. October 31, 2024 Hearing: Justin's Waiver of Service of Rachael's Initial DVRO Request

Justin next notes that at the October 31, 2024 hearing, he was informed for the first time that Rachael had filed a DVRO request on October 17, 2024. Justin further states that, at the October 31, 2024 hearing, he waived service of Rachael's DVRO request.

Justin asserts his waiver of service was "[c]oerced" by "combined pressure from opposing counsel and the court." In support of his argument, Justin adduces statements contained in a *proposed* settled statement for the October 31, 2024 hearing that *he* had submitted to the family court for certification. However, the court *declined* to certify the proposed settled statement as submitted. Rather, the court modified the proposed settled statement and certified the modified settled statement, which did *not* endorse the statements on which Justin now relies. (See Cal. Rules of Court, rule 8.137.)

Justin's argument relies on citations to the prior, uncertified version of the settled statement for the October 31, 2024 hearing. He has not cited to the actual record in this case. Accordingly, his argument fails for a lack of adequate citations to and support in the record. (*Osgood v. Landon* (2005) 127 Cal.App.4th 425, 435 ["It is the appellant's affirmative duty to show error by an adequate record."].)

18.

### C. October 31, 2024 Hearing: Family Court Calendared Custody and DVRO Matters for Joint Trial Setting Hearing

Justin next takes issue with the family court's decision to calendar both the custody and DVRO matters for a joint trial setting hearing on November 15, 2024. He argues that once opposing counsel secured a waiver of service of the DVRO from him, "counsel created the precise procedural posture necessary to immediately merge the DVRO allegations into the pending custody matter." Justin adds: "[T]he waiver, the [consolidation of the two matters], and the imposition of restrictive custody conditions [i.e., the new requirement that *exchanges* be supervised] occurred in immediate succession, without pause, [opportunity for] objection, or judicial inquiry." He argues that these developments deprived him of a meaningful opportunity to be heard.

Preliminarily, we note that Justin's argument is not adequately supported by appropriate citations to the record,[9] nor is it supported by citations to relevant legal authorities. (See, e.g., *United Grand Corp. v. Malibu Hillbillies, LLC* (2019) 36 Cal.App.5th 142, 156 (*Malibu Hillbillies*) [" ' "[i]f a party fails to support an argument with the necessary citations to the record, … the argument [will be] deemed to have been waived" ' "]; *Hodjat v. State Farm Mutual Automobile Ins. Co*. (2012) 211 Cal.App.4th 1, 10 (*Hodjat*) ["[A]ppellant is required to not only cite to valid legal authority, but also explain how it applies in his case."].)

Secondly, the settled statement for the October 31, 2024 hearing belies Justin's contentions. With respect to the hearing, the settled statement clarifies:

> "In order to vacate the November 4, 2024 hearing date on the DVRO and set both the DVRO and custody matter for a [trial] setting in a long cause courtroom, the [c]ourt addressed the issue of waiver of service. The [c]ourt's intent was to consolidate scheduling so that both the custody matter and the DVRO could be set together for trial setting. The

---

[9] For example, Justin once again cites to his *proposed* settled statement for the October 31, 2024 hearing, but his proposed settled statement, as submitted, was not certified by the family court.

October 31, 2024 hearing lasted approximately 20 minutes, during which *both* parties addressed the [c]ourt. There was significant discussion led by the [c]ourt regarding scheduling and whether hearing both matters together would be most efficient … [given] that the issues appeared related and best handled together. [Justin] expressed his belief that the issues raised by [Rachael] *both in the custody request and DVRO* were manufactured." (Italics added.)

The description of the October 31, 2024 hearing, as reflected in the settled statement, shows that the court heard from *both* parties as to the appropriateness of scheduling the two matters together for purposes of efficiency and further heard from Justin with regard to the allegations contained in Rachael's request for custody modification *and* her request for DVRO. Justin has not shown he was denied an opportunity to be heard.

Similarly, Justin has not shown the family court erred in calendaring both the custody matter and the DVRO matter for a trial setting conference on November 15, 2024. "It is firmly established that courts have fundamental inherent equity, supervisory, and administrative powers, as well as inherent power to control litigation before them." (*Lammers v. Superior Court* (2000) 83 Cal.App.4th 1309, 1321.) Indeed, "family law courts have the authority to exercise reasonable control over all proceedings connected with pending litigation, including formulating rules of procedure where justice requires it, in order to insure the orderly administration of justice." (*Ibid*.) In short, trial courts have wide latitude to control their dockets and the litigation before them, as the court did here.

Lastly, as detailed in the background section of this opinion, *ante*, Rachael eventually filed a second DVRO request, the family court granted a temporary restraining order, and the DVRO matter proceeded to a contested hearing *ahead* of the custody matter. Section 3044 creates "a rebuttable presumption that an award of sole or joint physical or legal custody of a child to a person who has perpetrated domestic violence is detrimental to the best interest of the child." Given the import of section 3044, the court's ultimate decision to address the DVRO matter before addressing the custody matter was also reasonable.

20.

***D.***      ***January 27, 2025 Hearing: Issuance of Temporary Restraining Order***

As noted in the background section of this opinion, *ante*, Rachael filed a second DVRO request on January 3, 2025. Thereafter, on January 22, 2025, Rachael filed a supplemental declaration, among other documents, in support of her second DVRO request. At the subsequent hearing on her second DVRO request on January 27, 2025, the family court stated it had received Rachael's "second request for a domestic violence restraining order," along with "*some additional information … regarding some additional conduct*," that is, the supplemental materials filed on January 22, 2025. (Italics added.) The court then issued a temporary DVRO and set the matter for a contested hearing on February 24, 2025, on the issue of a permanent DVRO.

Justin now contends he "was *never* served with, informed of, or given an opportunity to respond to" the "additional conduct" referenced by the court. (Italics added.) However, as reflected in the reporter's transcript of the hearing, Justin did not object when the court referred to the materials in question and issued a temporary restraining order pending a contested hearing on the issue of a permanent restraining order. The reporter's transcript does show that Justin did argue with the court as to how the court could take one person's statements and issue temporary restraining orders. The argument bordered on interrupting the court. Nonetheless, Justin fully participated in the January 27, 2025 hearing and the court addressed the points he raised. Subsequently, on February 21, 2025, he filed a written response to Rachael's second DVRO request, which included his 12-page typed declaration. On the date of the scheduled hearing, February 24, 2025, Justin requested a continuance which was granted to April 30, 2025. On April 24, 2025, Justin filed an additional declaration of himself for the hearing. On April 30 and May 1, 2025, Justin participated in the contested hearing on the issue of a permanent DVRO.

To the extent Justin is suggesting he had inadequate notice with regard to the issuance of the temporary DVRO, this contention is unavailing. The family court is

empowered to issue a temporary DVRO on an ex parte basis. (*Davila*, *supra*, 29 Cal.App.5th at p. 226 [temporary DVRO may be issued on an ex parte basis without notice, but permanent restraining order may only be issued " 'after notice and a hearing' "]; see §§ 6320, subd. (a), 6322, 6340, subd. (a), 6345, subd. (a).) Furthermore, there is no dispute that Justin had notice of the February 24, 2025 hearing and subsequent contested dates on the permanent DVRO.

### E. Judicial Bias

Justin further contends: "Taken together, the coerced waiver, strategic consolidation, reliance on unserved allegations, and the court's silence in response to due-process objections constitute a structural denial of notice and a meaningful opportunity to be heard." Justin adds: "The court abandoned its duty to remain neutral and safeguard fundamental parental rights." However, as discussed above, Justin has not shown error, let alone reversible error.

## IV. Justin has not Shown the Family Court Committed Evidentiary Errors at the April 30 and May 1, 2025 Contested Hearing on Permanent DVRO

### A. Documentary Evidence

Justin makes a general argument that the family court did not consider certain items of documentary evidence that Justin had submitted to the court at various points in the proceedings. However, the trial court's issuance of the permanent DVRO that barred Justin from having any contact with Rachael, A.S., and Grant was based on the evidence presented at the contested hearing on April 30 and May 1, 2025. Furthermore, the record on appeal does not contain either a reporter's transcript or settled statement of that hearing, foreclosing Justin's claims of evidentiary error.

Justin argues the family court failed to consider the Tier II report's findings and to confront Rachael with those findings. He also contends the court did not consider the fact that Child Protective Services closed a complaint that Rachael had made against him. Specifically, Justin asserts: "These findings constituted independent, professional

determinations that no abuse existed. Yet the court failed to address these results, failed to assess their impact on [Rachael's] credibility, and failed to explain why such neutral agency conclusions were afforded no weight." Justin further argues that the court did not evaluate a "sworn letter" from him and supporting documents (including character reference letters) that collectively were attached to his February 21, 2025 response to Rachael's second DVRO request.

However, Justin has not provided record citations showing he introduced the above-mentioned reports and documents into evidence or otherwise addressed them at the contested hearing. Second, because Justin has not addressed evidence introduced at the contested hearing *by Rachael* or discussed the *comparative* probative value of the items on which he bases his argument, he has *not* shown that the court's ostensible failure to consider these items was prejudicial. Third, " 'it is the trial court's role to assess the credibility of the various witnesses, [and] to weigh the evidence to resolve the conflicts in the evidence,' " as it sees fit.[10] (*Nevarez v. Tonna* (2014) 227 Cal.App.4th 774, 786.) Finally, Justin has cited no authority for the proposition that the family court was required to address in its ruling every item of evidence that was before it. In short, Justin has not affirmatively shown the court prejudicially erred.

Furthermore, Justin did not secure a reporter's transcript of the April 30 and May 1, 2025 contested hearing. "It is the appellant's affirmative duty to show error by an adequate record." (*Osgood v. Landon*, *supra*, 127 Cal.App.4th at p. 435 [appellant failed to secure a hearing transcript].) A " 'necessary corollary to this rule [is] that a record is

---

[10] "Conflicts in the evidence, conflicting interpretations thereof and conflicting inferences which reasonably may be drawn therefrom present issues of fact for determination by the trier of fact, who 'is the sole judge of the credibility of the witnesses'; may 'disbelieve them even though they are uncontradicted if there is any rational ground for doing so'; and, in the exercise of a sound legal discretion, may draw or may refuse to draw inferences reasonably deducible from the evidence." (*Coutts v. Grant* (1960) 184 Cal.App.2d 255, 257.)

inadequate, and appellant defaults, if the appellant predicates error only on the part of the record he provides the trial court, but ignores or does not present to the appellate court portions of the proceedings below which may provide grounds upon which the decision of the trial court could be affirmed.' " (*Ibid.*)

### B. A.S.'s Testimony

Justin contends he had "lawfully subpoenaed the minor child to testify." He adds: "Despite having multiple lawful means to receive the child's testimony, the court refused all of them." However, Justin does not provide any citations to the record for the latter assertion. Therefore, we cannot determine when the family court excluded A.S.'s testimony or the circumstances under which the court did so; nor can we properly evaluate the court's basis for doing so.[11]

Justin further contends that exclusion of A.S.'s testimony "was a profound abuse of discretion and denied [him] a fair hearing." However, Justin's argument rests only on conclusory assertions and does not adequately address the question of prejudice from the exclusion of A.S.'s potential testimony. (See *Conservatorship of Farrant* (2021) 67 Cal.App.5th 370, 378 [" '[A]n abuse of discretion results in reversible error only if it is *prejudicial*.' "]; see also *People v. Anderson* (2001) 25 Cal.4th 543, 580 ["the reviewing court must know the substance of the excluded evidence in order to assess prejudice"]; *Shaw v. County of Santa Cruz* (2008) 170 Cal.App.4th 229, 282 ["the failure to make an adequate offer of proof in the court below ordinarily precludes consideration on appeal of an allegedly erroneous exclusion of evidence"]; accord, Evid. Code, § 354, subd. (a).)

Moreover, Justin's argument fails because, as stated, he has not provided a record citation to the court's ruling excluding A.S.'s testimony and the record on appeal does not

---

[11]    Rachael points out that Justin "professed to not being entirely sure if he wanted to call [A.S. as a witness at the contested hearing] and never filed a witness list with her name on it."

24.

contain a reporter's transcript of the contested hearing.  (See *Estate of Fain* (1999) 75 Cal.App.4th 973, 992 ["Where no reporter's transcript has been provided and no error is apparent on the face of the existing appellate record, the judgment must be *conclusively presumed correct* as to *all evidentiary matters*."].)

### C.    Ring Video

Justin further contends Rachael did not provide Ring video footage that he had "lawfully subpoenaed."  Without supplying any record citation, he states that Rachael "asserted that the Ring video no longer existed and had purportedly been deleted by Ring due to the passage of time."  He further contends, without providing citations to appropriate legal authorities, that the family court was required to inquire into the circumstances under which the video was deleted.  To the extent Justin sprinkles his argument with a few citations to legal authorities, he does not explain their relevance or how they apply here.

We conclude Justin has forfeited his argument for failure to provide adequate record citations and citations to appropriate legal authorities.  (*Malibu Hillbillies*, *supra*, 36 Cal.App.5th at p. 156 [" ' "[i]f a party fails to support an argument with the necessary citations to the record, … the argument [will be] deemed to have been waived" ' "]; *Hodjat*, *supra*, 211 Cal.App.4th at p. 10 ["an appellant is required to not only cite to valid legal authority, *but also explain how it applies in his case*" (italics added)].)  In any event, without a reporter's transcript of the hearing, Justin cannot show prejudice.

To the extent Justin further argues that the family court's evidentiary decisions "reflect a pattern of prejudicial decision-making that deprived [him] of a fair adjudication and materially affected the outcome," this claim similarly fails given the foregoing discussion as well as the absence of a reporter's transcript of the contested hearing.

## V.    Family Court's Post-Hearing Written Ruling

Finally, Justin challenges the family court's conclusions as reflected in the court's post-hearing written ruling.  His chief complaint is that, in reaching its conclusions, the

25.

court did not properly consider the evidence before it.  For example, he argues that "the court substituted noise for evidence and abdicated its duty to distinguish genuine safety concerns from strategic narrative construction."  However, once again Justin addresses only evidence that he considers favorable to him and does not support his assertions with appropriate citations to relevant legal authorities.

In any event, Justin's contentions are unavailing because, in the absence of a reporter's transcript of the contested hearing, we must presume the family court's factual findings are supported by substantial evidence.  (*Gilman v. Dalby* (2021) 61 Cal.App.5th 923, 939 [" 'an appellant who attacks [an order or] judgment but supplies no reporter's transcript will be precluded from raising an argument as to the sufficiency of the evidence' "]; *National Secretarial Service, Inc. v. Froehlich* (1989) 210 Cal.App.3d 510, 522 [" '[i]t is elementary and fundamental that on a clerk's transcript appeal[,] the appellate court must conclusively presume that the evidence is ample to sustain the findings' "].)  Nor has Justin shown that the court abused its discretion in issuing a five-year restraining order.  We therefore affirm the court's issuance of the five-year DVRO.

## DISPOSITION

The order is affirmed.  Rachael is awarded her costs on appeal.


DE SANTOS, J.

WE CONCUR:


LEVY, Acting P. J.


SNAUFFER, J.

26.